No. 24-11009-FF

In the United States Court of Appeals
for the Eleventh Circuit

―――――――――――――――

UNITED STATES OF AMERICA,
Plaintiff–Appellee,

v.

SAMUEL ARTHUR THOMPSON,
Defendant–Appellant.

―――――――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NO. 20-CR-00026 (Hon. Brian J. Davis)

―――――――――――――――

**ANSWERING BRIEF FOR THE UNITED STATES
REDACTED VERSION**

―――――――――――――――

GREGORY W. KEHOE
United States Attorney

DAVID RHODES
Assistant United States Attorney
Chief, Appellate Division
United States Attorney's Office
Middle District of Florida

MATTHEW R. GALEOTTI
Head of the Criminal Division

JENNY C. ELLICKSON
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Suite 1264
Washington, DC 20530
(202) 329-1447
jenny.ellickson@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In addition to the persons identified in the certificate of interested persons and corporate disclosure statement in defendant Samuel Thompson's principal brief, the following persons have an interest in the outcome of this case:

1.  Brown, D. Rodney, Assistant United States Attorney;

2.  Ellickson, Jenny C., Attorney, Criminal Division, United States Department of Justice;

3.  Galeotti, Matthew R., Head of the Criminal Division, United States Department of Justice;

4.  Hoppmann, Karin, former Acting United States Attorney;

5.  Jacksonville Jaguars, LLC;

6.  Kehoe, Gregory W., United States Attorney;

7.  Lopez, Maria Chapa, former United States Attorney.

DATED: JUNE 9, 2025

/s/ Jenny C. Ellickson
JENNY C. ELLICKSON
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice

**STATEMENT REGARDING ORAL ARGUMENT**

The United States believes that the facts and legal arguments are adequately presented in the briefs and record and that oral argument would not significantly assist the Court's decisional process.  Fed. R. App. P. 34(a)(2)(C).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................... C-1

STATEMENT REGARDING ORAL ARGUMENT .................................... i

TABLE OF AUTHORITIES ........................................................... v

JURISDICTIONAL STATEMENT ............................................... 1

STATEMENT OF THE ISSUES ................................................. 1

STATEMENT OF THE CASE .................................................... 2

    I.    Procedural History ...................................................... 2

    II.    Statement of Facts ..................................................... 2

        A.    Thompson repeatedly accesses the Jaguars' computer network without authorization and disrupts their Jumbotrons ....................................................... 3

        B.    The FBI searches Thompson's home, and Thompson flees to the Philippines ...................................... 7

        C.    Further investigation reveals that Thompson received, possessed, and produced child pornography ..................... 8

            1.    Thompson receives and possesses child pornography ........................................... 8

            2.    Thompson produces child pornography in his home ................................................. 11

    III.    Rulings Under Review and Standards of Review ...................... 13

SUMMARY OF ARGUMENT .................................................. 15

ARGUMENT ................................................................ 17

    I.    Thompson validly waived his right to counsel ........................... 17

A.    Background ..................................................... 17

B.    Thompson validly waived his right to counsel, and that waiver remained knowing and intelligent after the second superseding indictment ......................... 22

II.    The district court acted within its discretion in denying Thompson's motion to compel discovery ................................. 27

A.    Background ..................................................... 27

B.    The government satisfied its discovery obligations, and the district court reasonably rejected Thompson's challenges to the format of discovery ................................. 32

III.    The district court acted within its discretion in denying Thompson's motion to continue trial ......................................... 36

A.    Background ..................................................... 36

B.    The district court's denial of Thompson's continuance motion was reasonable and did not prejudice Thompson ....................................................... 41

IV.    The district court correctly denied Thompson's motion to suppress ........................................................................ 44

A.    Background ..................................................... 44

B.    The magistrate judge acted within her discretion in denying Thompson's subpoena requests ........................... 47

C.    The search-warrant affidavit established probable cause ................................................................... 50

D.    The search warrant satisfied the Fourth Amendment's particularity requirement ................................. 51

E.    The good-faith exception to the exclusionary rule applies ............................................................... 54

V.     The district court did not err in allowing MV-2 to testify using a two-way television system ..................................................... 55

    A.     Background ..................................................... 55

    B.     The record supports the district court's finding that MV-2 was unable to testify in Thompson's presence ......... 58

    C.     Thompson has failed to show that Section 3509(b)(1)(D) is plainly unconstitutional as applied to him ............................................................. 60

CONCLUSION ............................................................ 62

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Barnes v. Secretary, Dep't of Corrections*,
  888 F.3d 1148 (11th Cir. 2018) ............................................................ 60-61

*Brady v. Maryland*,
  373 U.S. 83 (1963) ................................................................................. 35

*Coy v. Iowa*,
  487 U.S. 1012 (1988) .............................................................................. 59

*\*Faretta v. California*,
  422 U.S. 806 (1975) ................................................................................ 13

*\*Franks v. Delaware*,
  438 U.S. 154 (1978) .................................................................. 16, 45, 47-48

*Groh v. Ramirez*,
  540 U.S. 551 (2004) ........................................................................... 53-54

*United States v. Alfonso*,
  104 F.4th 815 (11th Cir. 2024) ........................................................... 15, 60

*United States v. Amede*,
  977 F.3d 1086 (11th Cir. 2020) ............................................................... 27

*\*United States v. Barsoum*,
  763 F.3d 1321 (11th Cir. 2014) .......................................................... 47-49

*United States v. Bolatete*,
  977 F.3d 1022 (11th Cir. 2020) ............................................................... 61

*United States v. Bush*,
  110 F.4th 1246 (11th Cir. 2024) .............................................................. 22

*United States v. Campbell*,
  26 F.4th 860 (11th Cir. 2022) (en banc) .................................................. 26

*United States v. Chalker*,
  966 F.3d 1177 (11th Cir. 2020) .................................................................. 41

*United States v. Fee*,
  425 Fed. Appx. 847 (11th Cir. 2011) ........................................................ 59

*United States v. Garcia*,
  7 F.3d 885 (9th Cir. 1993) ......................................................................... 58

*United States v. Gilmore*,
  No. 23-12062, 2025 WL 881449 (11th Cir. Mar. 21, 2025) ....................... 54

*\*United States v. Grubbs*,
  547 U.S. 90 (2006) ...............................................................................51, 54

*United States v. Grushko*,
  50 F.4th 1 (11th Cir. 2022) ....................................................................... 53

*United States v. Hakim*,
  30 F.4th 1310 (11th Cir. 2022) ...........................................................13, 25

*United States v. Hameen*,
  Nos. 19-14279 & 22-12968, 2023 WL 6053541 (11th Cir. Sept. 18,
  2023), *vacated,* 144 S. Ct. 2712 (2024) ...................................................... 24

*United States v. Hamilton*,
  591 F.3d 1017 (8th Cir. 2010) ................................................................... 54

*United States v. Hegwood*,
  562 F.2d 946 (5th Cir. 1977) ..................................................................... 48

*United States v. Jordan*,
  316 F.3d 1215 (11th Cir. 2003) ................................................................. 35

*United States v. Kimball*,
  291 F.3d 726 (11th Cir. 2002) ................................................................... 23

*United States v. Langford*,
  647 F.3d 1309 (11th Cir. 2011) ................................................................. 42

*United States v. Markovich*,
95 F.4th 1367 (11th Cir. 2024) ................................................. 13

*United States v. McBride*,
362 F.3d 360 (6th Cir. 2004) ..................................................... 24

*United States v. McCall*,
84 F.4th 1317 (11th Cir. 2023) (en banc) ...................................... 50, 54-55

*United States v. Moses*,
137 F.3d 894 (6th Cir. 1998) ..................................................... 58

*United States v. Muho*,
978 F.3d 1212 (11th Cir. 2020) .............................................. 14, 49

*United States v. Nunez*,
137 Fed. Appx. 214 (11th Cir. 2005) ........................................... 24

*United States v. Owen*,
963 F.3d 1040 (11th Cir. 2020) .............................................. 22-24, 26

*United States v. Pendergrass*,
995 F.3d 858 (11th Cir. 2021) ............................................... 14, 41

*United States v. Protho*,
41 F.4th 812 (7th Cir. 2022) ..................................................... 14

*United States v. Pulliam*,
748 F.3d 967 (10th Cir. 2014) ................................................. 53-54

*United States v. Rivers*,
134 F.4th 1292 (11th Cir. 2025) ............................................... 14

*United States v. Sotelo*,
130 F.4th 1229 (11th Cir. 2025) ............................................... 34

*United States v. Stanley*,
739 F.3d 633 (11th Cir. 2014) ............................................. 26-27, 61

*United States v. Stein*,
846 F.3d 1135 (11th Cir. 2017) ............................................... 36

## Statutes, Rules, and Constitutional Provisions

U.S. Const. amend. IV ................................................... 50

18 U.S.C. § 922 ............................................................. 2

18 U.S.C. § 1030 ......................................................2, 50-51

18 U.S.C. § 2250 ........................................................... 2

18 U.S.C. § 2251 ........................................................... 2

18 U.S.C. § 2252 ........................................................... 2

18 U.S.C. § 2260A .......................................................... 2

18 U.S.C. § 3231 ........................................................... 1

*18 U.S.C. § 3509 ............................ 14-16, 31-33, 35, 55-56, 58, 61

28 U.S.C. § 1291 ........................................................... 1

Fed. R. App. P. 34 .........................................................i

Fed. R. Crim. P. 16 ...................................................... 32

Fed. R. Crim. P. 17 .................................................... 47-48

## Other Authorities

11th Cir. Crim. Pattern Jury Instructions (Apr. 2024) .................... 50

S. Rep. No. 99-432 (1986) ................................................ 50

## JURISDICTIONAL STATEMENT

Defendant Samuel Thompson appeals the judgment of conviction in his criminal case. The district court had jurisdiction under 18 U.S.C. § 3231 and entered judgment on March 28, 2024. Doc.309.[1] Thompson filed a timely notice of appeal on April 2, 2024. Doc.312. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether Thompson validly waived his right to counsel.

2.    Whether the district court appropriately denied Thompson's motion to compel discovery.

3.    Whether the district court acted within its discretion in denying Thompson's motion to continue trial.

4.    Whether the district court correctly denied Thompson's motion to suppress evidence obtained pursuant to the search warrant for his home.

5.    Whether the district court appropriately allowed a child victim to testify using a two-way television system.

---

[1] "Doc." refers to numbered documents and entries on the district court's docket, followed by the relevant page numbers within each document, *e.g.*, "Doc.309:1." "Br." refers to Thompson's opening brief.

## STATEMENT OF THE CASE

### I.    Procedural History

Following a jury trial, Thompson was convicted on one count of producing child pornography, in violation of 18 U.S.C. § 2251(a); one count of producing child pornography while being required to register as a sex offender, in violation of 18 U.S.C. § 2260A; two counts of possessing child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B); two counts of receiving child pornography, in violation of 18 U.S.C. § 2252(a)(2); one count of intentionally causing damage to a protected computer, in violation of 18 U.S.C. § 1030(a)(5)(A); two counts of failing to update sex-offender registration to disclose foreign travel, in violation of 18 U.S.C. § 2250(b); and one count of possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1).  Doc.309:1. The district court sentenced him to 2640 months of imprisonment, to be followed by a life term of supervised release.  Doc.309:3-4.

### II.    Statement of Facts

Samuel Thompson worked as an engineering contractor for the Jacksonville Jaguars football team.  After learning that Thompson had a prior felony conviction for child sodomy, the Jaguars declined to renew his contract. After his contract ended, Thompson remotely accessed the Jaguars' stadium computer system without authorization and disrupted the stadium's Jumbotrons

during three football games.  The Federal Bureau of Investigation (FBI) obtained a warrant to search Thompson's house and seized his iPhone, other electronic devices, and a gun.  Ten days later, Thompson fled to the Philippines, and he never updated his sex-offender registration to disclose that travel or a prior trip to the Bahamas.  Shortly thereafter, the FBI discovered child pornography on Thompson's iPhone, and further investigation revealed that Thompson had received and possessed child pornography on several electronic devices and had produced child pornography by filming two prepubescent boys in his home.  At trial, the government presented evidence of the following facts.

### A.   Thompson repeatedly accesses the Jaguars' computer network without authorization and disrupts their Jumbotrons

In approximately 2013, Thompson began working as a contractor for the Jaguars.  Doc.347:216.  On game days, Thompson was the chief engineer in the Jaguars' video-control room.  Doc.347:163; Doc.348:144-46.  He also helped design their stadium's videoboards (*i.e.*, Jumbotrons) and bragged that the videoboards "had his fingerprints all over them."  Doc.353:54; *see* Doc.348:144. Within the Jaguars organization, Thompson was the primary proponent of TeamViewer, a program that enabled devices outside the stadium to gain remote access to stadium computers, and he installed TeamViewer on the Jaguars' broadcast computers.  Doc.348:48-50.  He sometimes used his phone to

3

remotely control the videoboards, Doc.353:49, and bragged about his ability to do so, Doc.349:21-22; Doc.351:101, 103.

In late 2017, the Jaguars learned that Thompson had a prior conviction for sodomizing a child between the ages of 12 and 16. Doc.347:220; Doc.348:148. That conviction rested on Thompson's abuse of a boy whom he had befriended while working as a church youth leader in Alabama in the 1990s. Doc.348:194-206. In January 2018, the Jaguars advised Thompson that they would not be renewing his current contract, which was set to expire on March 31, 2018. Doc.347:218-19, 226-27. Thompson was "devastated" about losing his contract. Doc.351:242.

Five weeks before Thompson's contract ended, someone downloaded TeamViewer to a decommissioned Abekas Mira9120 computer at the Jaguars' stadium, and over the next several hours, Thompson's iPhone repeatedly used TeamViewer to connect to the Mira9120. Doc.346:214; Doc.347:178-79; Doc.351:115-20. Thompson's iPhone connected to the Mira9120 on at least four other occasions over the next month. Doc.351:121-25.

After Thompson's contract ended, he had no authorization to access the stadium's videoboards or computer systems. Doc.347:165. Following Thompson's departure, Jaguars personnel also removed TeamViewer from all computers on their inventory list. Doc.348:52-53, 57. The Mira9120 was not

4

on that list, however, and Jaguars staff did not realize that that computer was in the videoboard room.  Doc.348:59-61, 67-68.  Because the Mira9120 was on the same network as other stadium computers, it could access those other devices. Doc.348:64-65.

In addition to his iPhone, Thompson owned several other electronic devices, including an iPad and two ASUS laptops.  Doc.346:235-36; 351:226-27.  On September 15, 2018, Thompson's iPhone and iPad each connected to the Mira9120, and the following day, Thompson installed TeamViewer on one of his laptops.  Doc.351:135-39.  That night, during a game between the Jaguars and the New England Patriots, Thompson's laptop connected to the Mira9120. Doc.347:49; Doc.351:139.  One minute later, the Jaguars' south videoboard malfunctioned, going partially blank and displaying color bars.  Doc.347:166-68; Doc.351:139.  Four minutes after that malfunction, Thompson's laptop disconnected from the Mira9120.  Doc.351:139.

Shortly thereafter, Thompson texted a former coworker, stating that he had seen the videoboard malfunction on television.  Doc.347:60-61.  Thompson wrote, "I know exactly what the problem is and I can fix it in less than a minute (of course, I would need to be there)."  Doc.347:61.  Over the next few days, Thompson mentioned the videoboard failure to several Jaguars staffers, and he

5

told one person that he "could have fixed the south board in less than 5 minutes."  Doc.351:141-42.

On November 18, 2018, TeamViewer was installed on Thompson's other laptop, which then connected to the Mira9120.  Doc.347:53-54; Doc.351:145-47.  At approximately the same time, during a game between the Jaguars and the Pittsburgh Steelers, both videoboards malfunctioned, with portions of both going blank.  Doc.347:171-72; Doc.351:147.  The next month, on December 2, 2018, during a game between the Jaguars and the Indianapolis Colts, the same laptop again connected to the Mira9120 through TeamViewer, Doc.347:54, and both videoboards malfunctioned, displaying garbled pictures and exhibiting zoom and alignment problems.  Doc.347:173-77.

Jaguars staff traced the intrusions back to the Mira9120, Doc.346:214; Doc.347:178-79, and determined that someone was using TeamViewer to access that computer and cause the videoboard outages, Doc.348:67-69; Doc.349:94-95.  To confirm that suspicion, Jaguars personnel set up a "honeypot" to monitor the Mira9120 while isolating that computer from game-day operations.  Doc.346:214-15; *see* Doc.347:183-84; Doc.348:69-70.  When the Jaguars carried out the honeypot operation during a game on December 16, 2018, one of Thompson's laptops connected to the Mira9120 via TeamViewer, but the intruder was unable to access other stadium computers.  Doc.346:220;

Doc.349:67-68; Doc.351:148-49.  The videoboards functioned properly during that game.  Doc.349:95.

The activity that Jaguars personnel observed during the honeypot indicated that the intruder had an intimate knowledge of their unique network setup.  Doc.348:83-86.  Records from TeamViewer and Comcast later revealed that, on the day of the honeypot, the intruder had remotely accessed the Mira9120 from the IP address assigned to Thompson's home.  Doc.346:220-23.

## B.    The FBI searches Thompson's home, and Thompson flees to the Philippines

On July 17, 2019, the FBI executed a search warrant at Thompson's home and seized his iPhone, iPad, ASUS laptops, and a desktop computer from his garage.  Doc.346:227, 233-36; Doc.347:32.  Thompson told the FBI that he also had a computer in a storage unit, and the FBI later seized that computer with his consent.  Doc.347:26.  In addition, the FBI found a gun in Thompson's nightstand.  Doc.348:181-86; Doc.351:225-28.

In a voluntary interview during the search, Thompson told two FBI agents that he had not used TeamViewer since leaving the Jaguars, Doc.348:226, and he attributed the recent videoboard disruptions to "[m]emory leaks" and blamed his Jaguars replacement, Doc.347:35-36; *see* Doc.347:43-44.  After the agents showed Thompson evidence connecting his home IP address to the honeypot intrusion, however, he became "evasive."  Doc.347:37-38.

7

Thompson also mentioned that he had just returned from the Bahamas. Doc.347:30-31. Further investigation confirmed that Thompson had been in the Bahamas from July 6 to July 14, 2019. Doc.347:83. As part of his sex-offender registration obligations, Thompson was required to report that trip, but he never did so. Doc.349:13; *see* Doc.348:257-68.

Approximately 10 days after the search, Thompson emptied his bank account and fled to the Philippines. Doc.347:92, 154. He never reported that travel, either, Doc.349:13, and he remained in the Philippines until January 2020, Doc.349:137.

### C.    Further investigation reveals that Thompson received, possessed, and produced child pornography

After the search, the FBI discovered child pornography on Thompson's iPhone. Doc.349:138. Further investigation revealed that Thompson had received and possessed child pornography on numerous occasions and had produced a child-pornography video in his home in June 2019.

### 1.    *Thompson receives and possesses child pornography*

In May 2017, Thompson signed up for an account with MEGA, an application often used to trade child pornography. Doc.349:162-63. Two months later, Thompson's Gmail address sent a message reading, "Trade?" to an email address containing the phrase "[w]orlddreamofnakedkids." Doc.347:85; *see* Doc.347:41. In November 2017, Thompson downloaded a

Hide Photos Video Safe application to his iPhone.   Doc.349:197-98.   The application's label was "Calculator%," and it functioned as a calculator, but users could hide files within the application and input a password to access them.   Doc.349:198-99.   Thompson stored child pornography inside the application, using his Alabama inmate number as his password.   Doc.349:202.

On January 24, 2018, Thompson's Gmail address received a personal message from a user of the forum "Only Nude Boys!"   Doc.347:86; Doc.349:166-67.   The message referenced the user's MEGA folders and stated, "[T]ell me when you're ready to receive again."   Doc.347:86.   Two days later, Thompson visited his brother in Texas, connected to his brother's WiFi Internet, logged into his MEGA account, and downloaded a child-pornography image titled "vAVBHarL" to his iPhone.   Doc.349:141, 152-56; Doc.351:10.   That image depicted a prepubescent boy holding his naked genitalia.   Doc.349:144-45.

In July 2018, Thompson purchased a Tor browser and installed it on his iPad.   Doc.349:229.   Tor provides access to the "dark web," a part of the Internet where child-pornography websites are more prevalent.   Doc.348:243-44.   In June 2019, Thompson repeatedly used the Tor browser on his iPad to search for child pornography.   Doc.349:229-36.   The next month, someone again used that Tor browser to search for "[b]oy vid."   Doc.351:161-63.   Shortly thereafter,

Thompson's iPad downloaded three zip folders containing child pornography. Doc.351:156-59. One folder contained 17 videos of the same nude boy engaging in masturbation and other acts of lascivious exhibition, and the folder's title indicated that the boy was 13 years old. Doc.349:184-88. The other two folders each contained one video of boys engaging in sexual acts. Doc.349:189-93.

The FBI's review of Thompson's devices revealed additional child pornography. His iPhone contained at least 30 child-pornography images involving lascivious exhibitions of children's genitals, including a copy of the "vAVBHarL" image that Thompson had downloaded while visiting his brother in Texas. Doc.349:144-45, 148. His iPad contained at least 280 child-pornography videos and 3000 child-pornography images, including sadistic and masochistic material, the "vAVBHarL" image, and the videos described in the previous paragraph. Doc.349:169, 184, 189-92, 215. The garage computer had a list of links to files with names indicative of child pornography, although the FBI was unable to find actual child pornography on that computer. Doc.351:175-79.

In addition, a search of the computer from Thompson's storage unit revealed that one of the computer's two hard drives contained at least seven child-pornography videos and 400 child-pornography images. Doc.349:241, 245-48. Two of the videos were in deleted space and depicted an adult man

10

engaging in sexual acts with a prepubescent child.  Doc.349:249-53, 255.  The hard drive also contained artifacts indicating that child pornography had been deleted or erased from the drive.  Doc.349:248.  The computer's other hard drive likewise contained files indicating that it had been used to store or process child pornography.  Doc.349:246.

### 2.    *Thompson produces child pornography in his home*

In the summer of 2019, Thompson was working from home, while also taking care of three children: Minor Victim 1 (MV-1), Minor Victim 2 (MV-2), and Minor Victim 3 (MV-3).[2]  Doc.351:244-46.  ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████  That summer, MV-1 was ██ years old, MV-2 was ████, and MV-3 was ████.  Doc.353:13, 83, 135.  The boys were "always at the house," and Thompson was the only adult in the home when they were there.  Doc.351:245.  On one occasion, he gave the boys his iPad, and they accidentally accessed a child-pornography website and saw images of little boys having sex.  Doc.353:142-43.  MV-3 also saw Thompson

---

[2]  This brief uses pseudonyms to protect these children's privacy.

sitting at his computer in the garage and masturbating to a video of two boys having sex.  Doc.353:143-45.

Thompson sometimes asked the boys to bathe together at his house, and he sometimes got in the tub with them.  Doc.353:112-13.  On several occasions, Thompson touched MV-2's penis, usually when MV-2 was getting out of the shower.  Doc.353:25-26, 40-42.  Thompson told MV-2, "It's our little secret and don't tell anybody."  Doc.353:27.  Thompson sometimes watched MV-3 while MV-3 bathed or showered, and at least once, he took a shower with MV-3.  Doc.351:247-48; Doc.353:150.  On another occasion, Thompson intentionally exposed his genitals to MV-3 in the kitchen.  Doc.353:140-41.

Thompson sometimes directed the boys to remove their clothes and play "naked tag."  Doc.353:146-47; *see* Doc.353:29, 109-10.  The boys usually played the game in the living room while Thompson watched and filmed them with his phone.  Doc.353:109-10, 148; *see* Doc.353:100-01.  No one else was in the house during those games, and Thompson told the boys that they were not allowed to talk about the game because he "would get in trouble."  Doc.353:111; *see* Doc.353:117.  MV-3 did not want to play naked tag, but he thought that he was not allowed to leave because Thompson blocked the front door during the game.  Doc.353:147.

On June 10, 2019, someone filmed a 24-second video of MV-1 and MV-2 playing naked in Thompson's living room.  Doc.349:203-09; Doc.351:260.  The video focused on MV-1's genitalia, which were displayed throughout the video.  Doc.349:206.   At one point, Thompson's voice was audible in the video.  Doc.349:207-08.  Thompson saved the video and 22 images of the naked boys in the Calculator% application on his iPad.  Doc.349:202-04.  Nineteen of the images depicted lascivious exhibitions of MV-1's genitalia.  Doc.349:212-13.

## III.   Rulings Under Review and Standards of Review

Thompson sought to represent himself at trial, and at a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975), the magistrate judge granted his request for self-representation.  Doc.337:33.  Thompson challenges (Br.14-22) the validity of his waiver of his right to counsel.  This Court reviews the validity of that waiver de novo.  *United States v. Hakim*, 30 F.4th 1310, 1318-21 (11th Cir. 2022).

Thompson challenges (Br.22-32) the district court's denial of his motion to compel certain discovery.  *See* Doc.235:5.  This Court reviews that decision for abuse of discretion.  *United States v. Markovich*, 95 F.4th 1367, 1375 (11th Cir. 2024).

Thompson challenges (Br.32-38) the district court's denial of his motion to continue trial. ███████████ This Court reviews that decision for abuse of discretion. *United States v. Pendergrass*, 995 F.3d 858, 870 (11th Cir. 2021).

Thompson moved to suppress evidence obtained in the search of his home, *see* Doc.132, and he sought to subpoena five witnesses in connection with that motion, *see* Docs.166, 167, 168, 169, 170. He challenges (Br.39-58) the magistrate judge's denial of those subpoena requests, *see* Doc.176:2, and the district court's denial of his suppression motion, *see* Doc.268:1-4. This Court reviews for abuse of discretion the denial of Thompson's subpoena requests. *United States v. Muho*, 978 F.3d 1212, 1219 (11th Cir. 2020). With respect to Thompson's motion to suppress, this Court reviews the district court's legal conclusions de novo and its factual findings for clear error, construing the facts in the light most favorable to the government. *United States v. Rivers*, 134 F.4th 1292, 1302 (11th Cir. 2025).

Thompson challenges (Br.58-65) the district court's decision to allow MV-2 to testify at trial using a two-way television system pursuant to 18 U.S.C. § 3509(b)(1)(B). *See* Doc.267:7-9. The Court reviews legal issues relating to 18 U.S.C. § 3509(b)(1)(B) de novo and reviews any underlying factual determinations for clear error. *United States v. Protho*, 41 F.4th 812, 825 (7th Cir. 2022). Because Thompson has raised a constitutional challenge to Section

3509(b)(1)(D) for the first time on appeal, this Court reviews that claim only for plain error.  *See United States v. Alfonso*, 104 F.4th 815, 828 (11th Cir. 2024).

## SUMMARY OF ARGUMENT

1.    Thompson validly waived his right to counsel.  The magistrate judge conducted a thorough *Faretta* hearing in 2022, and at the end of that hearing, Thompson knowingly, intelligently, and voluntarily waived his right to counsel and chose to represent himself at trial.  That waiver remained valid after the February 2023 return of the second superseding indictment because the magistrate judge took multiple steps to ensure that Thompson understood the new charges and their potential penalties and that he continued to knowingly and voluntarily choose self-representation.

2.    The district court acted within its discretion in denying Thompson's motion to compel discovery.  The government gave Thompson ample opportunity to inspect the data on his electronic devices and provided him with copies of that data when statutorily permitted to do so.  Thompson has identified no error in the district court's interpretation or application of 18 U.S.C. § 3509(m), which restricts discovery of material that constitutes child pornography.  And Thompson fails to show that the denial of his motion to compel violated his due-process rights or caused him any prejudice.

3. The district court reasonably denied Thompson's motion to continue trial. Contrary to Thompson's contention, he had ample time to work with experts, and Thompson has not identified any evidence that an expert would have presented if the district court had granted a continuance. He therefore fails to show that he suffered any prejudice from the court's decision.

4. Nor did error occur in connection with Thompson's suppression motion. The magistrate judge appropriately denied Thompson's request to subpoena witnesses to further his effort to make the preliminary showing required for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). The search warrant satisfied the Fourth Amendment's requirements, and in any event, the exclusionary rule's good-faith exception would preclude suppression.

5. The district court properly allowed MV-2 to testify using a two-way television system pursuant to 18 U.S.C. § 3509(b) because MV-2's pretrial testimony indicated that he would experience debilitating fear in Thompson's presence. Moreover, any error was harmless because MV-2's testimony was cumulative of other evidence. And Thompson has failed to show that Section 3509(b) is plainly unconstitutional as applied to him.

16

## ARGUMENT

### I.    Thompson validly waived his right to counsel

Thompson knowingly, intelligently, and voluntarily waived his right to counsel at a 2022 *Faretta* hearing.  Contrary to his contention (Br.14-22), that waiver remained valid after the return of the second superseding indictment.

### A.    Background

In April 2021, a six-count superseding indictment charged Thompson with possessing child pornography, receiving child pornography, intentionally causing damage to protected computers, possessing a firearm as a felon, and two counts of failing to update his sex-offender registration.  Doc.39:1-4.  Following that indictment, Thompson told his counsel, Eric Roper, that he wanted to represent himself.  Doc.50:1.

In February 2022, the magistrate judge held a *Faretta* hearing to determine whether Thompson was knowingly, intelligently, and voluntarily waiving his right to counsel.  Doc.337:3-4.  Thompson explained that he was 51 years old and had completed the eleventh grade, and the magistrate judge observed that a doctor had found Thompson capable of representing himself.  Doc.337:7-10.  At the magistrate judge's request, Thompson described his prior experience with lawyers, both in this case and in his 1995 sexual-abuse case.  Doc.337:10-14.

17

The government and the magistrate judge then summarized the charges in the first superseding indictment and their sentencing implications, and Thompson confirmed that he understood the nature of the offenses, the elements, and the possible penalties. Doc.337:14-24. Thompson also confirmed that he understood that he might not recognize all of his available defenses. Doc.337:24. The magistrate judge discussed the rules of procedure, evidence, and courtroom decorum with Thompson, and Thompson confirmed that he understood the relevant procedures, had been reviewing the rules, and understood that representing himself could diminish the effectiveness of his defense. Doc.337:25-28. Thompson further confirmed his understanding that he needed to be prepared to proceed with trial on its scheduled date, and he acknowledged that he had no prior experience presenting a case in court. Doc.337:28-29. The magistrate judge asked Thompson what role he had played in the preparation of his defense at his prior criminal trial, and he replied, "I was a passenger on that ride, and it cost me dearly." Doc.337:29-30.

The magistrate judge told Thompson about the benefits of having standby counsel and explained that standby counsel "could step in" to represent him if he wanted that "at some point." Doc.337:30. Thompson said that he was interested in having standby counsel. Doc.337:31. He also confirmed that he had made an independent decision to waive counsel and had arrived at that

decision freely, voluntarily, and knowingly, without anyone threatening, forcing, or coercing him.  Doc.337:31-32.

At the end of the hearing, the magistrate judge again warned Thompson about the risks of self-representation and "strongly urge[d]" him not to represent himself.  Doc.337:33.  Despite the magistrate judge's warnings, Thompson said that he wanted to represent himself, and the magistrate judge found that he was knowingly, voluntarily, and freely waiving his right to counsel.  *Ibid.*  The magistrate judge accordingly allowed Thompson to represent himself, and she appointed Roper as standby counsel.  Doc.337:33-34.

In January 2023, the FBI finally managed to gain access to Thompson's iPad and discovered child pornography.  Doc.351:39-40.  That pornography included the video of MV-1 and MV-2 in Thompson's living room.  *See* p. 13, *supra*.  On February 22, 2023, the grand jury returned a second superseding indictment that added four new child-pornography counts based on the iPad evidence.  Doc.178:3-6.  Two of the new counts charged Thompson with offenses relating to his production of child pornography (*i.e.*, the video of MV-1 and MV-2).  Doc.178:3-4.  The other two counts charged Thompson with a second count of receiving child pornography and a second count of possessing child pornography.  Doc.178:4-6; *see* Doc.39:1-2.

19

Five days later, Thompson appeared before the same magistrate judge for an arraignment. Doc.363:2. The government summarized the charges in the new indictment and described the statutory penalties for each count. Doc.363:6-13. The government also advised Thompson that, if he were convicted on all counts and received consecutive terms of imprisonment, he would serve a minimum term of 35 years and a maximum of 220 years. Doc.363:12. At the end of the government's recitation, Thompson confirmed that he understood the nature of the charges and the possible penalties and that he had received a copy of the new indictment. Doc.363:13.

Three days later, on March 2, 2023, the parties again appeared before the magistrate judge for a hearing on Thompson's pending suppression motion. Doc.194:5-6. Early in the hearing, Thompson objected to his leg shackles, and he cited a decision of this Court for the proposition that such shackles can "confuse" a defendant, "impair his ability," and "significantly affect the strategy he chooses to follow." Doc.194:15-16. The magistrate judge told Thompson that she had allowed him to represent himself based on her findings at the *Faretta* hearing. Doc.194:17. The magistrate judge also observed that Thompson had standby counsel who was "able to step in" if Thompson needed an attorney. *Ibid.* The magistrate judge then asked Thompson, "[A]re you able to move forward in representing yourself?" *Ibid.* He replied, "I am." *Ibid.* The

20

magistrate judge told Thompson to "alert the Court" if, at any point, he found that he was no longer able to represent himself, and Thompson agreed. Doc.194:19.   The magistrate judge advised Thompson that, absent such notification, she would assume that he was "fit to proceed" in representing himself in accordance with her findings at the earlier *Faretta* hearing. *Ibid.*

The magistrate judge revisited the question of Thompson's self-representation three more times over the next day.  Before Thompson began cross-examining the government's witness at the suppression hearing, the magistrate judge asked Thompson whether he intended "to continue with self-representation at this time."  Doc.194:85.  Thompson replied, "Yes, Your Honor." *Ibid.* At the end of that day, the magistrate judge asked Thompson to "confirm for the record" that he still felt that he could "move forward and represent [himself]."  Doc.194:243.   Thompson again replied, "Yes, Your Honor." *Ibid.* When the hearing continued the next morning, the magistrate judge asked Thompson how he was feeling and whether he wanted "to move forward with self-representation" that day.  Doc.184:6.   Thompson again replied, "Yes, Your Honor." *Ibid.*

Three months later, on June 15, 2023, the parties appeared before the magistrate judge for the final day of the suppression hearing, and the magistrate judge again revisited Thompson's waiver of his right to counsel.  Doc.209:5.

21

The magistrate judge referenced the earlier *Faretta* hearing and stated, "I just want to confirm with you today, as I did at the last hearing, that you are prepared to continue to represent yourself. Is that the case here today?" Doc.209:6. Thompson replied, "Yes, Your Honor." *Ibid.*

### B. Thompson validly waived his right to counsel, and that waiver remained knowing and intelligent after the second superseding indictment

Under *Faretta*, Thompson had a constitutional right to represent himself as long as his waiver of the right to counsel was knowing, voluntary, and intelligent. *United States v. Bush*, 110 F.4th 1246, 1248 n.1 (11th Cir. 2024). Thompson does not dispute that he validly waived his right to counsel at the 2022 *Faretta* hearing. Shortly after the February 2023 return of the second superseding indictment, the magistrate judge advised Thompson of the new penalties he faced, and Thompson subsequently and repeatedly confirmed that he still wished to represent himself. Thompson's waiver thus remained valid after the second superseding indictment. No *Faretta* error occurred.

This Court considers eight factors when assessing the validity of a defendant's waiver of his right to counsel, *United States v. Owen*, 963 F.3d 1040, 1049 (11th Cir. 2020), and the magistrate judge addressed all eight factors at Thompson's 2022 *Faretta* hearing. Specifically, the magistrate judge considered (1) Thompson's age, educational background, and physical and mental health,

22

*see* Doc.337:7-10; (2) the extent of his contact with lawyers prior to trial, *see* Doc.337:10-14; (3) his knowledge of the nature of the charges, possible defenses, and penalties, *see* Doc.337:14-24; (4) his understanding of rules of procedure, evidence, and courtroom decorum, *see* Doc.337:25-28; (5) his experience in criminal trials, *see* Doc.337:29-30; (6) the appointment of standby counsel, and the extent to which such counsel would help Thompson, *see* Doc.337:30-31, 34; (7) whether Thompson had experienced mistreatment or coercion, *see* Doc.337:31-32; and (8) whether he was trying to manipulate the events of trial, *see* Doc.337:28-29.   *See also Owen*, 963 F.3d at 1049 (listing factors).   The magistrate judge also repeatedly warned Thompson about the risks of self-representation and "strongly urge[d]" him not to represent himself.  Doc.337:33; *see* Doc.337:26-29.  At the end of the hearing, Thompson told the magistrate judge that he still wished to waive his right to counsel and represent himself. Doc.337:33.

That colloquy shows that Thompson knowingly and voluntarily waived his right to counsel in 2022.  *Cf. Owen*, 963 F.3d at 1049-53 (weighing the eight factors described above and determining that defendant's waiver was valid); *United States v. Kimball*, 291 F.3d 726, 730-32 (11th Cir. 2002) (per curiam) (same).  Thompson does not argue otherwise.  He also acknowledges that a valid waiver of the right to counsel remains in effect at subsequent proceedings, at

least "in the absence of an explicit revocation by the defendant or a change of circumstances that would suggest that the district court should make a renewed inquiry of the defendant." *United States v. McBride*, 362 F.3d 360, 367 (6th Cir. 2004); *see* Br.17-20 (citing cases).  This Court has recognized the same principle in two unpublished decisions.  *See United States v. Hameen*, Nos. 19-14279 & 22-12968, 2023 WL 6053541, at *2 (Sept. 18, 2023) (per curiam), *vacated,* 144 S. Ct. 2712 (2024); *United States v. Nunez*, 137 Fed. Appx. 214, 215-16 (11th Cir. 2005) (per curiam).

Thompson contends, however, that a substantial change occurred in this case in February 2023, when the second superseding indictment charged him with four new child-pornography counts, thereby increasing his potential penalties.  The government acknowledges that those new charges affected one of the eight factors that this Court evaluates when assessing the validity of Thompson's waiver, *i.e.*, "the defendant's knowledge of the nature of the charges, possible defenses, and penalties." *Owen*, 963 F.3d at 1049.  Thompson's waiver nevertheless remained valid after that indictment because the magistrate judge ensured that Thompson understood the implications of the new indictment and continued to choose self-representation.

First, at Thompson's arraignment on the second superseding indictment, the magistrate judge confirmed that Thompson understood the new charges and

their possible penalties.  At the magistrate judge's direction, the government described the counts in the new indictment, highlighted the differences between the new indictment and the prior one, and explained the new penalties Thompson faced.  Doc.363:3, 6-13.  The government advised Thompson that Count 4, which charged him with producing child pornography, carried a maximum term of imprisonment of 50 years.  Doc.363:8.  The government also told Thompson that if he were convicted on all counts, he would serve a minimum term of 35 years of imprisonment and a maximum of 220 years. Doc.363:12.  At the end of the government's recitation, the magistrate judge asked Thompson whether he understood the nature of the charges and the possible penalties, and Thompson said that he did.  Doc.363:13.  Thompson also confirmed that he had received a copy of the new indictment.  *Ibid.*  Collectively, that colloquy demonstrates that Thompson understood "the likely consequences of conviction" on the second superseding indictment.  *United States v. Hakim*, 30 F.4th 1310, 1322 (11th Cir. 2022).

At the rearraignment, the magistrate judge did not ask Thompson about his self-representation.  But over the next four days, the magistrate judge repeatedly questioned Thompson to confirm that he still wanted to represent himself.  *See, e.g.*, Doc.194:17 ("[A]re you able to move forward in representing yourself?"); Doc.194:85 ("[I]t is your intention to continue with self-

representation at this time?"); Doc.194:243 ("[L]et's confirm for the record that you still do feel like you can move forward and represent yourself; is that correct?"); Doc.184:6 ("[A]re you wanting to move forward with self-representation today?").  Each time, Thompson confirmed that he wanted to proceed with self-representation.  *See* Doc.194:17, 85, 243; Doc.184:6.  Three months later, the magistrate judge raised the issue again, and Thompson again maintained that he wanted to represent himself.  *See* Doc.209:5-6.  Those exchanges confirmed that Thompson was adhering to his waiver of his right to counsel, with full knowledge of the likely consequences of conviction on the second superseding indictment.

Thompson's opening brief does not mention any of these 2023 colloquies, much less explain why they collectively failed to constitute the "second *Faretta* inquiry" that he claims was required.  Br.1; *see id.* at 4-8, 14-22.  He has therefore forfeited any such argument.  *See United States v. Campbell*, 26 F.4th 860, 871-72 (11th Cir. 2022) (en banc).

In any event, Thompson concedes (Br.15) that a defendant may validly waive his right to counsel even without a *Faretta* hearing, "'[a]s long as the record establishes that [he] understood the risks of self-representation and freely chose to face them.'"  *Owen*, 963 F.3d at 1049; *see United States v. Stanley*, 739 F.3d 633, 645 (11th Cir. 2014) ("The failure to hold a *Faretta* hearing "'is not

error as a matter of law.'"); *United States v. Amede*, 977 F.3d 1086, 1110-11 (11th Cir. 2020) ("[W]hile the district court did not conduct another formal colloquy, Amede's background, experience, and conduct, the district court's pretrial colloquy, and the district court's explanation at sentencing, all taken together, demonstrate that Amede knowingly and voluntarily waived his right to counsel at sentencing."). The record here confirms the ongoing validity of Thompson's waiver. *See Stanley*, 739 F.3d at 646 (considering "the whole record" in determining whether waiver was knowing and voluntary).

## II. The district court acted within its discretion in denying Thompson's motion to compel discovery

The government gave Thompson ample opportunity to inspect the electronic data in this case and provided him with copies of that data when statutorily permitted to do so. Thompson's claim (Br.22-32) that the district court should have granted his motion to compel lacks merit.

### A. Background

In July 2022, the FBI allowed Thompson to review forensic copies of his iPhone and one of the hard drives from the computer seized from his storage unit. Doc.221:4-5. Both devices contained child-sexual-abuse materials (CSAM). Doc.221:4-5. Thompson asked the government to provide him with a copy of the iPhone, with the CSAM removed, but the government declined to do so. Doc.221:4.

In October 2022, Thompson moved to compel the government to produce his iPhone, the storage-unit computer, and four other computers "for examination." Doc.139:2. In response, the government told the magistrate judge that those items were available for Thompson's inspection and that he could make arrangements with the FBI to view that evidence. Doc.143:3. The government later clarified that Thompson could also request copies of specific files from his devices and that the government would provide those copies if the files were free of contraband. Doc.159:1. The magistrate judge denied Thompson's motion to compel. Doc.153:2; Doc.186:2 n.1.

In January and February 2023, FBI agents met with Thompson at his request and brought him forensic copies of his iPhone, one of the storage-unit computer's hard drives, and the other four computers identified in his motion to compel. Doc.211:5; Doc.221:4-6. Thompson requested copies of approximately 129 gigabytes of files from various devices, and the government later provided those copies. Doc.211:5-6.

In June 2023, Thompson requested approximately 74,000 files from the storage-unit computer's second hard drive. Doc.221:6. That computer contained "a large quantity of CSAM," Doc.211:3, and without reviewing each file that Thompson was requesting, the FBI could not guarantee that those files contained no CSAM, *see* Doc.211:7. The government initially advised

28

Thompson that the FBI could not review all of the files that he wanted copied, and the government offered to have the FBI meet with Thompson in jail so that he could either review the materials on the FBI's computer or narrow his request. *Ibid.* After further litigation and several months of work, the FBI reviewed all 74,000 files and provided copies of those files to Thompson. Doc.234:4.

In the meantime, Thompson moved to "direct the government to comply with" Federal Rule of Criminal Procedure 16(a)(1)(E), Doc.210:1, and he refused to meet with the FBI to review his devices, Doc.215:4. He also demanded a copy of the entire contents of the storage-unit computer, absent any CSAM. Doc.221-1:1. The government declined to provide such a copy but again offered to meet with Thompson and bring the computer for his inspection. *Ibid.*

On October 4, 2023, the magistrate judge reviewed Thompson's discovery objections and determined that the government had complied with its discovery obligations. Doc.222:9-10. At a district-court hearing the following day, Thompson argued for the first time that his opportunities to inspect the electronic data were "not acceptable" because he had to review that data using the FBI's preferred forensic program. Doc.342:7-8. The government told the court that a computer scientist had met with Thompson at the jail to help him

29

with the software, and the government offered to have that scientist return to provide further assistance. Doc.342:13. Thompson responded that he wanted "unfettered access" to his data, without having to use the forensic program. Doc.342:13-14. The court told Thompson to put his disagreements in writing so that the court could address them. Doc.342:21.

On October 12, 2023, at Thompson's request, the FBI visited Thompson in jail and brought him forensic images of the storage-unit computer and a second computer. Doc.234:3. Shortly after Thompson began reviewing the storage-unit computer, he remarked that he was trying to copy files from the device to his laptop. *Ibid.* The FBI told him not to copy the files until they could verify that the files did not contain CSAM. *Ibid.* Thompson became irate and screamed at the FBI representatives to leave. *Ibid.* The government subsequently arranged for the FBI to take temporary custody of Thompson at the federal courthouse for four days the following week, for seven hours each day, to give him full-day access to the seized computers in the grand-jury space. *Ibid.* The government told Thompson that it would make the same arrangements for additional days if he desired and that it would also appoint an FBI employee who was not part of the prosecution team to review files to verify that they did not contain contraband and confirm that the government could provide those files to Thompson. Doc.234:3-4. Thompson agreed to that

arrangement and spent four days reviewing the electronic data.  Doc.234:4; Doc.245:9.

On October 16, 2023, Thompson filed "[a]mended [o]bjections" to the magistrate judge's discovery orders.  Doc.232:1.  He asked the district court to direct the government to allow him to copy any non-CSAM data from his devices to a portable hard drive.  Doc.232:7-10.  The district court construed Thompson's objections as a motion to compel and denied the motion. Doc.235:2, 5.  The court determined that 18 U.S.C. § 3509(m) prohibited the government from relinquishing control of any electronic device that allegedly contained child pornography and from allowing that device's duplication. Doc.235:2-3.  The court also found the government had been "flexible and accommodating" in ensuring that Thompson and his defense team had "more than an ample opportunity to inspect all data" and that the government had provided copies of that data when statutorily permitted to do so.  Doc.235:5. The court also observed that Thompson had offered no evidence or argument that "his defense has been short-circuited by the manner in which the Government has provided him data."  *Ibid.*

31

**B.    The government satisfied its discovery obligations, and the district court reasonably rejected Thompson's challenges to the format of discovery**

Thompson's motion to compel sought discovery of six electronic devices: his iPhone, the storage-unit computer, and four other computers. Doc.139:2. Under Federal Rule of Criminal Procedure 16, the government had a general obligation to allow Thompson "to inspect and to copy" those devices and the data they contained. Fed. R. Crim. P. 16(a)(1)(E)(iii). But that general obligation was subject to the restrictions in Section 3509(m), which limits discovery of "any property or material that constitutes child pornography." 18 U.S.C. § 3509(m)(1); *see also* Fed. R. Crim. P. 16(d)(1) (authorizing court to deny or restrict discovery "for good cause"). As the district court found, the government satisfied its obligations under both provisions by giving Thompson "more than an ample opportunity" to inspect all of his data and by providing Thompson with copies that data in accordance with Section 3509(m). Doc.235:5; *see generally* pp. 27-31*, supra*.

1.    To start, the record refutes Thompson's suggestion that the government refused to disclose non-CSAM data to him. The government repeatedly told Thompson that he could make an appointment to review any of the devices and could request copies of specific files. *See, e.g.*, Doc.159:1-2. In early 2023, Thompson inspected forensic copies of all six devices, save for one

32

hard drive from the storage-unit computer that the government also offered to bring to him.  Doc.221:4-5, 8.  Thompson requested copies of specific files from each computer, and the government produced those copies.  *See* Doc.221:4-7; Doc.234:4.  And Thompson has failed to identify any specific data that he lacked an opportunity to inspect, or that the government refused to copy at his request.

Nor did the district court err in applying Section 3509(m).  Because that statute required the government or the court to retain care, custody, and control of "property or material that constitutes child pornography," 18 U.S.C. § 3509(m)(1), it precluded the government from giving Thompson custody or control of any devices that contained CSAM.  Thompson claims that the district court read Section 3509(m) more broadly, to encompass any device containing data or files that "could have been used to access, download, or store CSAM," Br.30, but the district court's order contains no such holding, *see* Doc.235. Rather, the district court stated that Section 3509(m)'s restrictions apply to any device "alleged to contain child pornography," Doc.235:3, and clarified that a device satisfied that standard if child pornography was present on the device or if facts existed that "strongly indicat[ed]" that child pornography was present, Doc.235:4.  Thompson does not explain why that construction of Section 3509(m) is erroneous.

The district court also did not abuse its discretion in declining to compel the government to provide Thompson with complete copies of devices that contained CSAM, with the CSAM removed. *See* Doc.235:3-4. As the government explained below, Thompson's request for such copies was prohibitively burdensome because each device might have contained additional CSAM that the government had not discovered, and the government would have to review every speck of data on each device to confirm that it was free of CSAM. Doc.339:11-12, 16-17; *see* Doc.211:7. The government also could not assume that forensic software would automatically "flag any un-encrypted child pornography." Br.31. Such software might identify *known* CSAM, *see United States v. Sotelo*, 130 F.4th 1229, 1241 n.3 (11th Cir. 2025) (describing hash-value matching), but Thompson's devices might have contained previously unknown CSAM, including additional CSAM that Thompson had produced himself. Thompson has cited no authority for the proposition that, in these circumstances, Rule 16 and Section 3509(m) required the government to create the "sanitized" copies that he requested.

The district court also correctly determined that the government made Thompson's data "reasonably available" to him within the meaning of Section 3509(m)(2). Material is made "reasonably available" under that provision if the government gives the defendant, his attorney, and his experts "ample

opportunity for inspection, viewing, and examination" at a government facility. 18 U.S.C. § 3509(m)(2)(B).  Thompson does not dispute that the government made his data available in that sense.  Although Thompson evidently would have preferred "to view the data in its native format," Br.31, the district court correctly recognized that Section 3509(m)(2) "does not require data presentation in a certain format," Doc.235:5.  The statute also did not require the government to give Thompson access to the data without FBI supervision.  *See* 18 U.S.C. § 3509(m)(2)(B).  In fact, the statute specifically authorizes the government to make the data available for review "at a Government facility."  *Ibid.*

Finally, Thompson purports to ground his discovery claims in the Due Process Clause, *see* Br.32, but he does not explain how that provision entitled him to the discovery that he sought.  Rule 16 identifies the materials that the government must produce at a defendant's request.  *See United States v. Jordan*, 316 F.3d 1215, 1249 (11th Cir. 2003).  In addition, *Brady v. Maryland*, 373 U.S. 83 (1963), establishes that defendants have a due-process right to disclosure of favorable material evidence, but that right "does not 'create a broad, constitutionally required right of discovery.'"  *Jordan*, 316 F.3d at 1251.  A defendant's right to discover exculpatory evidence also does not include the unsupervised right to search through the government's files, nor does it require the government "to deliver its entire file to the defense."  *Id.* at 1252.  And

Thompson cites no authority for the proposition that a defendant's constitutional right to present a defense includes the right to obtain the discovery that he describes.

In any event, even if Thompson's due-process claim had merit, he would not be entitled to reversal because he has failed to show any prejudice from the district court's denial of his motion to compel. Even in the *Brady* context, a defendant bears the burden of showing "'a reasonable probability that the outcome would have been different'" if the government had disclosed the evidence in question. *United States v. Stein*, 846 F.3d 1135, 1146 (11th Cir. 2017); *see id.* at 1145. Thompson has not even asserted—much less shown—any probability that the outcome of his trial would have been different if the district court had granted all of his discovery requests.

## III. The district court acted within its discretion in denying Thompson's motion to continue trial

The record confirms that the district court reasonably denied Thompson's motion for a continuance. Thompson's contrary arguments (Br.32-38) lack merit, and he fails to show any prejudice from that ruling.

### A. Background

In October 2021, Thompson sought authorization to hire a digital-forensics firm, Roloff Digital Forensics. Doc.76:1. The district court granted his request ▬▬▬▬▬▬▬. Doc.79:1-2. ▬▬▬▬▬▬▬▬▬▬

36

██████████████████████████████████████████

████████████████████

In August 2022, Thompson sought authorization to hire a second digital-forensics firm, Mulholland Forensics, ████████████████████████████████████. Doc.122:1, 5, 7. The court denied the motion, ████████████████████████████████████████████████. Doc.126:2, 4. ████████████████

████████████████████████████████████████████

██████████████████████

In September 2022, Thompson filed a renewed motion for authorization to hire Mulholland Forensics. Doc.130. The court asked Thompson to submit additional information to support that motion, Doc.340:21-26, and Thompson filed a supplemental brief ████████████████████████████

████████████████████████████████████████████

██████████████████████████, Doc.144:2-5, 7-11.

On January 12, 2023, the district court issued an order authorizing Thompson to hire Mulholland. Doc.160:3-4. Apparently unaware of that order, Thompson filed a motion ████████████ to withdraw his request for Mulholland's services. Doc.161:1. The court accordingly vacated its order authorizing funds for Mulholland. Doc.163:2.

In April 2023, Thompson moved for authorization to hire a third forensic expert, Richard Connor.  Doc.198:1-2.  ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████  The district court denied Thompson's motion in June 2023 ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████  on September 25, 2023, the district court authorized funding for Connor, Doc.217:1-2.  Thompson received notice of that order on October 2, 2023.  Doc.245:7.

From October 17 to 20, 2023, Thompson visited the federal courthouse each day to review electronic data.  ████████; Doc.296:3; *see* pp. 30-31, *supra*. During those visits, FBI agents repeatedly asked him when his expert would be coming to inspect the evidence, but Thompson never indicated whether or when that would happen.  Doc.296:3.

On October 23, 2023, Thompson made an oral motion to continue trial, which was set to begin in two weeks.  Doc.343:1-2.  Thompson stated that the

primary reason for his motion was "the forensic review," and the court told Thompson to submit an ex parte filing that explained in "much more detail" why he needed a continuance on that ground.  Doc.343:3.  The court denied Thompson's continuance request to the extent that Thompson sought a continuance on other grounds.  Doc.343:8-9.

███████████████, Thompson filed a written motion to continue trial ██

████████████████████████████████████████████

████████████████████████████████████████████

██████████    ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

███████████████████████████████████

███████████████████████ █ ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████ ████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████

Thompson's trial began on November 6, 2023, and he presented his defense case on November 15 and 16, 2023.  Doc.346:5; Doc.355:5-112; Doc.356:5-108.  After the jury's verdict, he moved for a new trial, claiming that the trial was unfair because he had no forensic expert.  Doc.287-2:1, 7-9.  The district court denied the motion.  Doc.307:5.  The court explained that the docket "patently refute[d]" Thompson's contention that the court had denied him adequate expert assistance.  Doc.307:2.  The court also found "no error" in its decision to deny Thompson's motion for a continuance, observing that Thompson had had access to experts "for years" and that the court had granted his request "to swap experts" more than a month before trial, but that Thompson had failed to schedule time for his expert to review the evidence.  Doc.307:2-3.

### B.   The district court's denial of Thompson's continuance motion was reasonable and did not prejudice Thompson

District courts have "'great latitude' with respect to scheduling" and "'broad discretion' in ruling on motions for continuances." *United States v. Pendergrass*, 995 F.3d 858, 870 (11th Cir. 2021). Accordingly, a district court errs in denying a requested continuance only if the denial is "'arbitrary and unreasonable and severely prejudices the moving party.'" *Ibid.* In evaluating whether the denial of a continuance meets that standard, this Court considers "the 'time available for preparation, the likelihood of prejudice from denial, the accused's role in shortening the effective preparation time, the degree of complexity of the case, and the availability of discovery from the prosecution.'" *Ibid.* In addition, when a criminal defendant claims that the denial left him with insufficient time to prepare for trial, he must identify the relevant evidence that he would have presented if he had received a continuance. *Ibid.* Taken together, those factors confirm that the district court acted well within its discretion in denying Thompson's continuance motion.

To start, Thompson has failed to identify any specific evidence that he would have presented if he had received a continuance, even though he must do so to satisfy his burden of showing that the denial of a continuance caused him "'specific substantial prejudice.'" *United States v. Chalker*, 966 F.3d 1177, 1193 (11th Cir. 2020). Instead, Thompson references an ex parte brief that he filed in

district court in November 2022, claiming that this brief "outlin[ed] what he expected an expert to be able to find or testify to" and demonstrates "how he was prejudiced" by the denial of a continuance the following year. Br.38 (citing Doc.144). To the extent that Thompson suggests that this Court "can find explanations in the trial court record" to support his position on appeal, this Court has rejected the practice of incorporating by reference arguments made in district court. *United States v. Langford*, 647 F.3d 1309, 1331 (11th Cir. 2011).

Furthermore, Thompson's 2022 district-court brief ███████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████

The history of this case also shows that Thompson had ample time to work with forensic experts before trial and that he bore principal responsibility for any shortening of that preparation time. From November 2021 through at least

42

January 2023, Thompson had authorization to work with his first digital-forensics firm, Roloff, ███████████████████████████████████

███████████████████. *See* Doc.79:1-2; Doc.160:3; ███████████. If Thompson had elected to continue working with Roloff, he would have more than two years of total time to prepare his case with a forensic expert. Instead, he decided to switch to a second digital-forensics firm, Mulholland, and the district court granted that request in January 2023. Doc.160:3-4. And if Thompson had followed through on working with Mulholland, he would have had their expert services for the ten-month period before trial. Instead, Thompson decided that he did not want to work with Mulholland after all. Doc.161:1.

In April 2023, Thompson had another change of heart about his expert strategy, and he moved to retain a third expert, Connor. Doc.198:1. ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████  ██████████  ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



The court acted well within its discretion in denying the requested continuance.

## IV.    The district court correctly denied Thompson's motion to suppress

The magistrate judge acted within her discretion in denying Thompson's premature subpoena requests.  In addition, the search warrant for Thompson's home satisfied the Fourth Amendment's requirements, and the good-faith exception applies in any event.  Thompson's contrary arguments (Br.39-58) lack merit.

### A.    Background

On July 11, 2019, FBI Special Agent Frank Norris applied for a warrant to search Thompson's home for evidence relating to the Jaguars' videoboard outages.   Doc.194:23-24; *see* Doc.208-2:2-34; Doc.208-23:2-3.   The warrant

application included a probable-cause affidavit, Doc.208-2:3-29, and two attachments, Attachment A and Attachment B, that respectively identified the location to be searched and the items to be seized, Doc.208-2:30-34. The magistrate judge issued the warrant. Doc.208-23:2-3. The warrant form incorporated Attachments A and B by reference, stating that the location to be searched was "more particularly described in Attachment A" and directing the reader to "see Attachment B" for the property to be seized. Doc.208-23:2. When FBI agents executed the search warrant at Thompson's home, they gave him a copy of the warrant, including Attachments A and B. Doc.194:75-76.

Thompson moved to suppress the evidence obtained through the search warrant, and he also requested a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Doc.132:1. After the magistrate judge scheduled a hearing on the motion, Thompson applied for subpoenas under Federal Rule of Criminal Procedure 17(b) to compel Agent Norris and five other witnesses to testify. Doc.176:1. ██████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ The magistrate judge granted Thompson's request to subpoena Agent Norris but denied his other requests ████████████████████████████████████████

██████████ .  Doc.176:2.  ██████████████████

████████████████████████████████

At the suppression hearing, Agent Norris testified that the FBI gave Thompson a copy of the search warrant, including Attachments A and B, on the day of the search.  *See* Doc.194:75-76.  Thompson also testified and told a different story, claiming that the FBI had given him a two-page document consisting of the warrant form and warrant return and had refused to give him Attachments A and B.  Doc.184:16-17.

Following the hearing, the magistrate judge recommended that the district court deny Thompson's suppression motion.  Doc.223:35.  As to Thompson's *Franks* claim, the magistrate judge found that Thompson had failed to make a preliminary showing that Agent Norris's affidavit contained any intentional or reckless misrepresentations or omissions.  Doc.223:24-25; *see* Doc.223:10-23.  The magistrate judge also determined that the misrepresentations and omissions Thompson alleged were immaterial to the probable-cause finding.  Doc.223: 25; *see* Doc.223:10-23.  In addition, the magistrate judge found that the FBI gave Attachments A and B to Thompson on the day of the search.  Doc.223:31-32.  Finally, the magistrate judge rejected Thompson's contention that affidavit failed to demonstrate probable cause.  Doc.223:33-34.

The district court adopted the report and recommendation over Thompson's objections.  Doc.268:1-4.

## B.   The magistrate judge acted within her discretion in denying Thompson's subpoena requests

Federal Rule of Criminal Procedure 17(b) allows an indigent defendant to subpoena a witness at the government's expense if, as relevant here, the defendant shows that the witness's presence is a "necessity" for "an adequate defense."  *Ibid.*  ███████████████████, Thompson did not satisfy that standard when he sought to subpoena five witnesses in support of his request for a *Franks* hearing.

To merit a *Franks* hearing, Thompson had to make "'a substantial preliminary showing'" that the search-warrant affidavit contained intentionally false or recklessly misleading statements or omissions that were "'necessary to the finding of probable cause.'"  *United States v. Barsoum*, 763 F.3d 1321, 1328 (11th Cir. 2014).  As part of that preliminary showing, Thompson had to provide "an offer of proof" to support his allegations and furnish reliable statements from witnesses or "satisfactorily explain[]" their absence.  *Franks*, 438 U.S. at 171. *Franks* does not contemplate that this preliminary showing will involve witness testimony.  *See id.* at 171-72.  Rather, the preliminary showing is a precursor to an evidentiary hearing, and a defendant must make that showing to obtain a

hearing.  *See ibid.*  In other words, witness testimony was not a "necessity" to Thompson's effort to make that showing.  Fed. R. Crim. P. 17(b).

Thompson does not challenge the district court's determination that he failed to make the substantial preliminary showing required for a *Franks* hearing. He also fails to explain why he was entitled to present witness testimony to support his request for a *Franks* hearing.  Instead, he argues that the subpoenas were necessary because the five witnesses "refus[ed]" to provide him with information that he claims was "central to the *Franks* inquiry."  Br.43.  But a Rule 17(b) subpoena is "not a discovery device," and Thompson must do more than "offer 'a feeling' that a witness could 'shed some light'" on the *Franks* issue. *United States v. Hegwood*, 562 F.2d 946, 952-53 (5th Cir. 1977).  And to the extent that Thompson argues that only a hearing could have established that any false statements or omissions in the affidavit were deliberate, he effectively "concedes that he failed to make a substantial *preliminary* showing of deliberate falsity and omission."  *Barsoum*, 763 F.3d at 1329.

Thompson also has not established that the witnesses' testimony would have shown that he "ha[d] authority to access" the computers at the Jaguars' stadium at the time of the videoboard outages.  Br.42.  Indeed, at trial, one of those witnesses testified that Thompson had no right to access those computers after March 2018.  *See* Doc.347:165. █████████████████████████

███████████████████████████████     ████████████████████

██████████████████████    And to the extent that Thompson sought to prove that the affidavit was inaccurate in stating that he had no authorized access to the computers "[a]s of February 23, 2018," Doc.208-2:6, rather than March 31, 2018, *see* Doc.132:12-14, the district court correctly recognized that any such discrepancy was immaterial because the affidavit described unauthorized accesses that occurred after both dates, Doc.268:3; *see* Doc.208-2:8, 11-12.

Finally, even if the magistrate judge somehow erred in denying Thompson's subpoena requests, any error was harmless because Thompson could not have made the preliminary showing required for a *Franks* hearing even if the witnesses had testified. *See United States v. Muho*, 978 F.3d 1212, 1219 (11th Cir. 2020) (harmless-error standard applies to denial of Rule 17(b) subpoena). As previously explained, Thompson had to demonstrate that the search-warrant affidavit would not have established probable cause without the alleged misrepresentations and omissions. *See Barsoum*, 763 F.3d at 1328-29. And as the district court found, the false statements and omissions that Thompson alleged were ultimately immaterial to the affidavit's probable-cause showing. Doc.268:2-3; *see* Doc.223:10-25

### C.    The search-warrant affidavit established probable cause

The Fourth Amendment requires that search warrants be supported by probable cause.  U.S. Const. amend. IV. To establish probable cause, a search-warrant affidavit must show "'a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *United States v. McCall*, 84 F.4th 1317, 1324 (11th Cir. 2023) (en banc).  When reviewing probable cause, courts give search-warrant applications "a 'commonsense' rather than 'hypertechnical' reading."  *Ibid.*  And this Court gives "'great deference'" to a lower court's determination of probable cause.  *Ibid.*  Here, the magistrate judge who issued the warrant correctly determined that the affidavit established probable cause to believe that violations of 18 U.S.C. § 1030(a)(2)(C) and (a)(5)(C) had occurred.

As relevant here, a person violates Section 1030(a)(2)(C) by intentionally accessing a computer without authorization and thereby "obtain[ing] . . . information."  18 U.S.C. § 1030(a)(2)(C).  In this context, "obtaining information" includes viewing data on the computer.  *See* 11th Cir. Crim. Pattern Jury Instructions O42.2 Annotations and Comments (Apr. 2024) (citing S. Rep. No. 99-432, at 6-7 (1986)).  The affidavit established probable cause to believe that Thompson accessed the Mira9120, without authorization, to obtain information in that sense.  Specifically, the affidavit indicated that Thompson used TeamViewer to access the Mira9120.  *See* Doc.208-2:7-14.  The affidavit

further alleged that TeamViewer enables "desktop sharing" and "file transfer between computers" and thus gave Thompson "remote access to the video board system."  Doc.208-2:7.  Those allegations support an inference that Thompson used TeamViewer to obtain information from the Mira9120.

The affidavit also established probable cause for a Section 1030(a)(5)(C) violation.  As relevant here, a Section 1030(a)(5)(C) violation occurs when an unauthorized computer access causes "loss."  18 U.S.C. § 1030(a)(5)(C).  "Loss" includes "any reasonable cost to any victim, including the cost of responding to an offense."  18 U.S.C. § 1030(e)(11).  The affidavit sufficiently alleged that the unauthorized access of the Mira9120 caused such loss.  Specifically, the affidavit described how the Jaguars investigated and responded to that intrusion, *see* Doc.208-2:6-10, indicating that the intrusion caused the Jaguars to incur the costs of that internal investigation.

## D.    The search warrant satisfied the Fourth Amendment's particularity requirement

The Fourth Amendment "specifies only two matters that must be 'particularly describ[ed]' in the warrant: 'the place to be searched' and 'the persons or things to be seized.'"  *United States v. Grubbs*, 547 U.S. 90, 97 (2006).  The warrant for Thompson's home satisfied that particularity requirement by incorporating Attachments A and B by reference.

Thompson concedes that the warrant form "properly referenced" Attachments A and B, Br.56, and he does not dispute that those attachments particularly described the location to be searched and the items to be seized. Thompson claims, however, that suppression is required because the FBI did not give him Attachments A and B during the search. *See* Br.56-58. That contention is wrong on both the facts and the law.

On the facts, Agent Norris testified that Thompson received Attachments A and B at the time of the search and that the FBI had a "policy" of providing those attachments.[4] Doc.194:76. The magistrate judge found that testimony credible, *see* Doc.223:32, and the district court adopted that credibility finding, *see* Doc.268:4. That credibility finding, moreover, is consistent with a contemporaneous photograph showing that Thompson's copy of the warrant contained multiple stapled pages. *See* Doc.208-13:3.

In crediting Agent Norris's testimony about Attachments A and B, the magistrate judge and district court implicitly discredited Thompson's testimony that the FBI did not give him those attachments. Thompson disagrees with those credibility determinations, but when an officer's testimony directly

---

[4] Although Thompson claims that Agent Norris "equivocated" on that point, his record citation does not support that claim. *See* Br.57 (citing Doc.194:75).

conflicts with a defendant's, this Court defers to the trial judge's choice of whom to believe "'unless the judge credits exceedingly improbable testimony.'" *United States v. Grushko*, 50 F.4th 1, 11 (11th Cir. 2022). Because Agent Norris's testimony was not "exceedingly improbable," the district court did not clearly err in believing Agent Norris over Thompson.

In any event, even if Thompson did not receive copies of Attachments A and B, that circumstance would not require suppression. In arguing otherwise, Thompson relies on *Groh v. Ramirez*, 540 U.S. 551 (2004), but the Supreme Court's more recent decision in *Grubbs* recognizes that an executing officer need not "present the property owner with a copy of the warrant before conducting his search" and that the particularity requirement "'does not protect an interest in monitoring searches.'" 547 U.S. at 98-99. Rather, *Grubbs* explained, the Fourth Amendment protects property owners "by interposing, *ex ante*, the 'deliberate, impartial judgment of a judicial officer.'" *Id.* at 99. That analysis accords with the text of the Fourth Amendment, which "focus[es] solely on the warrant as issued to police rather than any copy given to the person or persons targeted by the search." *United States v. Pulliam*, 748 F.3d 967, 973 (10th Cir. 2014).

This Court has yet to address the issue in a published opinion, but since *Groh* and *Grubbs*, other circuits have determined that "the absence of an

53

incorporated warrant attachment during a search either lacks constitutional significance or does not warrant suppression." *United States v. Gilmore*, No. 23-12062, 2025 WL 881449, at *4 n.2 (11th Cir. Mar. 21, 2025) (per curiam) (unpublished) (citation omitted); *see, e.g.*, *Pulliam*, 748 F.3d at 973; *United States v. Hamilton*, 591 F.3d 1017, 1025-30 (8th Cir. 2010) (citing cases). And Thompson identifies no court that has suppressed evidence because the defendant's service copy of a search warrant did not include an incorporated document.

Citing *Groh*, Thompson contends that the particularity requirement also requires warrants to describe "the basis for probable cause for the search." Br.49. *Groh* does not support that proposition, *see* 540 U.S. at 554-61, and *Grubbs* refutes it, *see* 547 U.S. at 97-99.

### E.    The good-faith exception to the exclusionary rule applies

Even if Thompson could show a Fourth Amendment violation, he would not be entitled to suppression because the good-faith exception to the exclusionary rule would apply. That exception recognizes that, in an ordinary case, an officer cannot be expected to question the issuing judge's determination that a search warrant satisfied the Fourth Amendment's requirements. *McCall*, 84 F.4th at 1323. As explained at pp. 50-54, *supra*, the search-warrant affidavit satisfied the probable-cause requirement, and the warrant satisfied the

54

particularity requirement.  For the same reasons, the affidavit was not "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" and the warrant itself was not "'so facially deficient'" that the executing officers could not reasonably rely on its validity.  *McCall*, 84 F.4th at 1323.  Accordingly, even if the warrant's validity were "'doubtful or marginal,'" the good-faith exception would apply.  *Ibid.*

Finally, the denial of Thompson's suppression motion was necessarily harmless as to Count 10, which charged Thompson with failing to report his travel to the Philippines.  *See* Doc.178:6.  Thompson committed that offense after the search of his home, *see* p. 8, *supra*, and the evidence of that offense did not arise from the search, *see, e.g.*, Doc.348:281-92; Doc.349:8-14.

## V.    The district court did not err in allowing MV-2 to testify using a two-way television system

The record supports the district court's decision to allow MV-2 to testify using a two-way television system, and the statute authorizing that procedure is not plainly unconstitutional as applied to Thompson.  Thompson's contrary arguments (Br.58-65) lack merit.

### A.    Background

Under 18 U.S.C. § 3509, a child victim may testify by two-way television if the district court finds that "the child is unable to testify in open court in the presence of the defendant" for a specified reason.  18 U.S.C. § 3509(b)(1)(B); *see*

55

18 U.S.C. § 3509(b)(1)(A). One reason, relevant here, is that "[t]he child is unable to testify because of fear." 18 U.S.C. § 3509(b)(1)(B)(i). If the court allows the child to testify by two-way television, Section 3509(b)(1)(D) provides that the child will testify in the presence of a limited set of persons, including "the attorney for the defendant not including an attorney pro se," and that the defendant will view and hear the child's testimony remotely. 18 U.S.C. § 3509(b)(1)(D). Section 3509(b)(1)(D) further states that "[t]he defendant shall be provided with the means of private, contemporaneous communication with the defendant's attorney during the testimony." *Ibid.*

Before trial, the government asked the district court to examine the child victims to determine whether they should testify by two-way television. Doc.244:4. The district court convened a hearing and questioned each child. Doc.267:7; *see* Doc.345:9-29. MV-1 and MV-3 both stated that they could probably testify in Thompson's presence without experiencing emotional trauma. Doc.267:7; *see* Doc.345:10-16, 25-29.

In contrast, MV-2 ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

The district court authorized MV-2 to testify using the court's two-way video-monitoring system.  Doc.267:9.  The court found that MV-2 "would be subject to panic attacks and locking up" if he had to testify in Thompson's presence and thus "would be unlikely to be able to testify."  Doc.267:7-8.  The court also observed that MV-2's inability to testify was "understandable" in light of Thompson's alleged abuse of MV-2, the nature of their relationship, and the "paralyzing and traumatic anxiety" that MV-2 would experience "when faced with recounting his abuse in [Thompson's] physical presence."  Doc.267:8.  The court found that using the two-way monitoring system would "ameliorate the emotional reaction [MV-2] would otherwise face," and the court required Thompson to rely on standby counsel to conduct MV-2's cross-examination. *Ibid.*  The court later denied Thompson's request for reconsideration. Doc.349:259; Doc.351:280.

Accordingly, Thompson watched and heard MV-2's trial testimony through a two-way television system.  Doc.353:8-11.  Thompson's standby counsel cross-examined MV-2 and spoke to Thompson before completing that examination.  Doc.353:36-38; *see* Doc.353:32-41.

### B. The record supports the district court's finding that MV-2 was unable to testify in Thompson's presence

The record supports the district court's determination that MV-2 was "unable to testify in open court in the presence of the defendant" within the meaning of 18 U.S.C. § 3509(b)(1)(B). In particular, MV-2's pretrial testimony established that he would be "unable to testify because of fear." 18 U.S.C. § 3509(b)(1)(B)(i).

This Court has yet to interpret that language in Section 3509(b)(1)(B)(i), but other circuits have determined that a child witness is "unable to testify because of fear" if the child "would suffer substantial fear or trauma and be unable to testify or communicate reasonably because of the physical presence of the defendant." *United States v. Moses*, 137 F.3d 894, 898 (6th Cir. 1998) (citing cases). That line of authority clarifies, however, that "the words 'unable to testify' do not mean that the child must be traumatized to the extent of being unable to utter any responses to questions whatsoever." *United States v. Garcia*, 7 F.3d 885, 889 n.1 (9th Cir. 1993). Rather, "the child's emotional trauma must be such that he or she 'cannot *reasonably* communicate' in the defendant's presence." *Ibid.* (emphasis added).

MV-2's pretrial testimony established that he would suffer that level of debilitating fear. ███████████████████████████████████████

███████████████████████████████████████████████

58

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████  The record thus

supports the district court's finding that MV-2 "would experience paralyzing and

traumatic anxiety" if he had to testify in Thompson's presence.  Doc.267:8.  And

that finding, in turn, establishes that MV-2 could not reasonably communicate

in that circumstance.

In arguing otherwise, Thompson appears to suggest (Br.61-62) that MV-2

could be considered "unable to testify" only if he were wholly incapable of

speaking in Thompson's presence, even after enduring an anxiety attack.  In

support of that position, Thompson cites *United States v. Fee*, 425 Fed. Appx. 847

(11th Cir. 2011) (per curiam), which upheld the use of two-way televised

testimony for a child who was unable to speak in the defendants' presence.  *See*

*id.* at 849-50.  But *Fee* did not hold that Section 3509(b)(1)(B) applies only in that

circumstance, *see id.* at 849-51, and Thompson identifies no decision adopting

that heightened standard.

Finally, even if the district court erred in finding that MV-2 was "unable

to testify," any error was harmless.  *See Coy v. Iowa*, 487 U.S. 1012, 1021-22

(1988) (harmless-error review applies to denial of face-to-face confrontation).

MV-2's limited trial testimony focused on two main topics: Thompson's abusive sexual conduct, *see* Doc.353:17-18, 25-30, 40-43, and Thompson's home and electronic devices, *see* Doc.353:19-23. Because that testimony was cumulative of other evidence, especially the testimony of MV-1, MV-3, and Thompson's wife, *see* Doc.351:218-38, 244-50, 259-61; Doc.353:106-19, 135-51, the jury would have found Thompson guilty even without MV-2's testimony.

## C.    Thompson has failed to show that Section 3509(b)(1)(D) is plainly unconstitutional as applied to him

On appeal, Thompson argues for the first time that Section 3509(b)(1)(D) is unconstitutional as applied to him based on the theory that the statute's procedure violated his right to self-representation. Because Thompson did not raise a constitutional challenge to Section 3509(b)(1)(D) below, this Court reviews that claim only for plain error. *See United States v. Alfonso*, 104 F.4th 815, 828-29 (11th Cir. 2024). To establish plain error, Thompson must show (1) error that is (2) plain, (3) affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* at 829.

Thompson fails show that Section 3509(b)(1)(D) is unconstitutional as applied to him, much less clearly and obviously so. "*Faretta* establishes a right to self-representation for criminal defendants, but the right is not absolute." *Barnes v. Secretary, Dep't of Corrections*, 888 F.3d 1148, 1159 (11th Cir. 2018). For example, *Faretta* allows standby counsel to participate at trial, even over the

defendant's objections, "as long as counsel does not seriously interfere with the defendant's opportunity to present his own case or undermine the jury's perception that the defendant is representing himself." *Ibid.* Thompson is thus mistaken in contending (Br.65) that "a district court cannot limit a defendant's right to self-representation" unless the defendant engages in obstructionist or disruptive behavior.

Here, Section 3509(b)(1)(D) required Thompson to watch and listen from another room while standby counsel cross-examined MV-2. But the statute also granted Thompson the ability to engage in "private, contemporaneous communication" with standby counsel during that testimony. 18 U.S.C. § 3509(b)(1)(D). The record confirms that Thompson engaged in such communication and that standby counsel conducted MV-2's cross-examination in coordination with Thompson. Doc.353:36-38; *see* Doc.353:32-41. Section 3509(b)(1)(D) accordingly ensured that Thompson received "'the core of the *Faretta* right'" because it preserved his "'actual control over the case he cho[se] to present to the jury.'" *Stanley*, 739 F.3d at 650.

Moreover, Thompson cannot show that Section 3509(b)(1)(D) is plainly unconstitutional because he has identified no Supreme Court or circuit precedent that "'directly resolv[es]'" that question in his favor. *United States v. Bolatete*, 977 F.3d 1022, 1036 (11th Cir. 2020). And because MV-2's remote

61

testimony was cumulative of other evidence, *see* pp. 59-60, *supra*, Thompson has also failed to show that the statute's alleged unconstitutionality affected his substantial rights or seriously affects the fairness, integrity, or public reputation of judicial proceedings.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

MATTHEW R. GALEOTTI
Head of the Criminal Division

DAVID RHODES
Assistant United States Attorney
Chief, Appellate Division
United States Attorney's Office
Middle District of Florida

/s/ Jenny C. Ellickson
JENNY C. ELLICKSON
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Suite 1264
Washington, DC 20530
(202) 329-1447
jenny.ellickson@usdoj.gov

JUNE 9, 2025

62

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,927 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point font.

DATED: JUNE 9, 2025

                                                    /s/ Jenny C. Ellickson
                                                    JENNY C. ELLICKSON
                                                    Attorney, Appellate Section
                                                    Criminal Division
                                                    U.S. Department of Justice